**T. B. WINGO, Claimant, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 17478.**

United States Court of Appeals
Fifth Circuit.

April 30, 1959.

James M. Roberts, Atlanta, Ga., for appellant.

Ralph Ivey, Asst. U. S. Atty., James W. Dorsey, U. S. Atty., Atlanta, Ga., Charles D. Read, Jr., Acting U. S. Atty., Atlanta, Ga., for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is an appeal from a judgment of forfeiture of a 1957 red Cadillac Coupe deVille. The libel was brought under 26 U.S.C.A. § 7302, alleging that the car had been forfeited to the United States by virtue of its use in a lottery business in Atlanta, Georgia by a Horace Ingram without his having registered, 26 U.S.C.A. § 4412, or paid the tax imposed on such businesses, 26 U.S.C.A. § 4411. The Ingram business was raided March 27, 1957, resulting, although not involved here, in Ingram's indictment and conviction. See Ingram v. United States, 5 Cir., 1958, 259 F.2d 886, certiorari granted, and now pending, 358 U.S. 905, 79 S.Ct. 234, 3 L.Ed.2d 227.

Wingo, admittedly innocent of any complicity, traded a Ford of his for Ingram's Cadillac, drove it briefly on March 25, 1957, and signed the contract of sale April 1, 1957. The District Court found that a lottery operation had been carried on from "Ingram's Garage," that the Cadillac was used by Ingram in pursuit of this business and ordered the forfeiture.

Wingo's brief correctly states the issue: "The only question involved in this appeal is whether there is sufficient evidence in the record to sustain the 'Findings of Fact' and 'Conclusions of Law' of the District Court."

This evidence was supplied by Carter (a local officer), Nelson (a local newspaper reporter) and Morris (an Internal Revenue Agent) who had kept "Ingram's Garage" under surveillance for some time prior to the raid. Both Carter and Morris were familiar with lottery operations and testified as experts.

We need not detail here the characteristics of a lottery business adequately established by credible evidence below. The Judge stated during the trial, "[A]re you about to prove the modus operandi of the lottery? * * * I can almost take judicial cognizance of it, but let him state very briefly." And we have formerly dealt with it in the cases subsequently cited and elsewhere.

Ingram's role in this operation was that of "banker." As the name suggests, the banker takes in the proceeds from the sale of tickets and pays the pick-up men for the "hits" they have sold. As the coin of this realm is coins, the banker must handle a substantial quantity.

■ The Government must show, of course, that Wingo's *Cadillac* "has been * * * used * * * in violating * * * the internal revenue laws * * * ," 26 U.S.C.A. § 7302, and not merely that *Ingram* was involved in an illegal lottery business. However, the Court may consider the circumstances surrounding the car's use in making this determination.

The raid on March 27, 1957, disclosed the following about "Ingram's Garage." Seven men were present, who were allegedly involved in the lottery business. Five had money on them in the amounts of $8,937, $784.45, $202.50, $45.92 and $91. See Estate of Phillips v. Commis-

sioner, 5 Cir., 1957, 246 F.2d 209, as to the role of large quantities of cash in this business. Officers found approximately 2,380 scratch pads of the type used in the lottery business, and 200–300 brown paper bags—"the hallmark of the calling." Carter v. United States, 5 Cir., 1956, 231 F.2d 232, 234, certiorari denied 351 U.S. 984, 76 S.Ct. 1052, 100 L. Ed. 1498; Townsend v. United States, 5 Cir., 1958, 253 F.2d 461, 465; Clay v. United States, 5 Cir., 1956, 239 F.2d 196, 201, note 7. There were also two "very large" boxes of coins, coin and currency wrappers, rubber bands, clips, and two lottery ribbons (with the winning number for the day of the raid). The garage office had barred windows of frosted glass, and double-locked steel-encased doors with panes of one-way glass. Morris testified that there were "garage operations there" as well, and mechanics were present at the time of the raid, but it is not clear whether any cars were ever worked on there that were not used exclusively by Ingram.

The garage had been watched off and on for three years, especially since January 1957 (by Nelson) and primarily during March (by both Carter and Nelson). Apparently Ingram obtained the Cadillac on March 13, because prior to that time he used a pink and white Oldsmobile. He and others were seen coming and going in both cars and standing around the garage talking. The Cadillac was used specifically on March 13, 18, 25 and 27.

Of course, the law is well settled that the mere use of a car as transportation to and from a business prohibited by Section 7302 does not subject it to forfeiture. United States v. Lane, 1953, 344 U.S. 630, 72 S.Ct. 459, 97 L.Ed. 622; United States v. One Ford Coach, 4 Cir., 1950, 184 F.2d 749. See United States v. General Motors Acceptance Corp., 5 Cir., 1956, 239 F.2d 102. But the District Court could properly consider that the operation of a lottery business, unlike an isolated still, Lane and One Ford, supra, requires a substantial use of automobiles to transport men, tickets and money. Transportation is therefore an essential ingredient in that business.

Moreover, Nelson and Carter both testified that Ingram removed four large, apparently heavily-loaded, bank-type cloth sacks from the Cadillac on March 13 and another sack on March 25.

It is true that this is really the strongest single piece of evidence the Government could produce. And no one testified as to the contents of those bags. One might theorize that they might have contained nuts and bolts, or pecans, or money for use in a legitimate business. But whatever *might* have been the sufficiency of this evidence taken alone, when it is considered, as it must be, in the context of the circumstances of *this* case, it is sufficient to warrant the District Court's inference that the sacks were being used for their accustomed purpose for the transfer of the large quantities of cash which this illicit business, indisputably established, just as indisputably required.

That activity, once established, marked the Cadillac as forfeited as of the moment of the event.

Affirmed.