UNITED STATES of America,
Plaintiff-Appellee,

v.

$7,382 IN UNITED STATES CURRENCY, Defendant,

Jack Roberts, Intervenor-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

ONE (1) 1979 LINCOLN CONTINENTAL MARK V AUTOMOBILE, VIN F9Y89S646982F, Defendant,

Jack Roberts, Intervenor-Appellant.

No. 82–4493.

United States Court of Appeals,
Fifth Circuit.

Nov. 3, 1983.

Michael B. Cohen, Chicago, Ill., for intervenor-appellant.

Dosite H. Perkins, Jr., Asst. U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before BROWN, WISDOM and JOHNSON, Circuit Judges.

PER CURIAM:

This is an appeal from a judgment of forfeiture of a 1979 Lincoln Continental Mark V automobile.[1]  We affirm.

The Government brought the complaint for forfeiture under 26 U.S.C. § 7302, alleging that the Lincoln had been forfeited to the United States by virtue of the claimant's use or intended use of the car in connection with his business of accepting wagers without having registered pursuant to 26 U.S.C. § 4412, or having paid the special tax imposed on such business by 26 U.S.C. § 4411 or the excise tax on wagers imposed by 26 U.S.C. § 4401.  The Lincoln was seized by special agents of the Internal Revenue Service on November 30, 1980. Roberts, the claimant, entered a guilty plea to a Bill of Information charging him with a violation of 26 U.S.C. § 7203, in that during the then current fiscal year he engaged in the business of receiving wagers on behalf of himself and others, and did willfully and knowingly fail to pay the special tax of $500 imposed upon persons engaged in the business of accepting wagers.

The district court found that the Government had shown by a preponderance of the evidence that Roberts was engaged in the business of accepting wagers and that he used the Lincoln automobile in connection with that business.  The court found that the totality of the circumstances demonstrated that the Lincoln was used in connection with the offense and that the car was an "essential ingredient" to Roberts' business of accepting wagers.  The court therefore entered a Judgment of Forfeiture.  The only issue on appeal is whether there is sufficient evidence in the record to support the court's finding that Roberts' car was used in connection with his business of accepting wagers.[2]  The judgment of

---

1. The judgment of forfeiture of $7,382 is not appealed.

2. Roberts' attorney conceded at oral argument that Roberts was indeed in the business of accepting wagers in violation of the internal

forfeiture must be affirmed unless this Court determines that the finding of the district court is clearly erroneous.

■ The Government must show by a preponderance of the evidence that the Lincoln was used or intended to be used in violating the internal revenue laws, 26 U.S.C. § 7302, in Roberts' acceptance of wagers without purchasing a gambling tax stamp. The mere use of a car as transportation to and from a business prohibited by section 7302 does not subject it to forfeiture. *T.B. Wingo v. United States,* 266 F.2d 421, 423 (5th Cir.1959). The property subject to forfeiture must have been intentionally used as an "active aid" in the violation of the internal revenue laws. *United States v. One 1968 Ford,* 425 F.2d 1084, 1085 (5th Cir.1970).

Roberts protests that the record is devoid of any evidence connecting the Lincoln automobile with his business of accepting wagers. The record reflects that the Lincoln was used on at least three specific occasions for the delivery of money from Shreveport, Louisiana: one trip to Armstead, Louisiana, where Roberts delivered $37,000 to Jimmy Black and two trips to Marshall, Texas, where Roberts delivered $11,000 to Robert Smith. It is Roberts' contention that he only pled guilty to accepting bets from certain persons [3] and that the evidence in the instant forfeiture case only shows that the Lincoln was connected to deliveries of money to Black and Smith, who were not among those from whom Roberts conceded he was accepting bets. At trial, it was Roberts himself who testified that the payments of money to Black and Smith had nothing to do with his business of accepting wagers but were merely related to his activities as a gambler or bettor. Roberts conceded the delivery of the money but claimed that he dropped the $37,000 off to Black as a favor to Stephens, and that the bets made by Black to Stephens were lawful because Stephens had a gambling tax stamp. Roberts' assertion relative to the conceded delivery of the money to Smith was that the payment was a "transfer payment" that had no connection with wagers by Roberts.[4]

In making this argument, Roberts is asking this Court to give credence to his testimony concerning the Lincoln's lack of any connection to his business of accepting wagers, and give credence to that testimony only. In *Wingo,* however, this Court held that the district court properly considered circumstantial evidence in finding that the car involved, a Cadillac, was used in violation of the internal revenue laws. *Wingo,* 266 F.2d at 423. In the instant case the district court properly considered the totality of the circumstances to infer that Roberts used the Lincoln in his bookmaking business. Roberts, by his plea of guilty, has conceded that he was in the business of accepting wagers and has also admitted that he made deliveries of money which was involved in bookmaking.[5] It was therefore subject to the discretion of the court whether it would credit Roberts' testimony that he dropped the money off to Black as a favor to Stephens. In addition, it was within the discretion of the court to credit the evidence that there was a business relationship of accepting wagers between Roberts and Stephens and that the two men were partners. The court could properly note that the operation of a bookmaking busi-

revenue laws. He protested, however, the court's finding that the Lincoln was used in connection with that violation.

3. These persons are enumerated in Plaintiff's Exhibit 15.

4. The district court recited:
Mr. Roberts said that that was a transfer payment, that it wasn't a payment of wagers that Mr. Smith might have bet—into some other bookie and had ten coming and that Mr. Roberts might have bet into some differ-

ent bookie and owed him ten and the bookie calls him on the phone and says "Roberts, would you go over to Marshall and pay Smith ten thousand dollars?" And that, therefore, the transfer payment then had no connection with wagers by Roberts.

5. Inconsistent with this admission, Roberts' attorney at oral argument contended that Roberts' bookmaking business was confined to his home and that on the road he was only a bettor.

ness involves taking bets, making payoffs, and making deliveries and collections of money involved in the wagers. Furthermore, the court could properly consider that the operation of Roberts' bookmaking business required the use of a car (Roberts' only car) because this type of business was necessarily highly mobile; that the totality of the circumstances warranted the inference that Roberts used the Lincoln to deal with his customers—that it was used either to transport money to a bettor or to take it from a bettor after settling up.

 Other evidence in the record further supports the district court's conclusion that the car was used as an active aid in Roberts' unlawful business. Ninety dollars worth of quarters was found in the Lincoln. Roberts does not dispute that the coins were used to make telephone calls in furtherance of his activities, but he claims that use of the Lincoln was confined to his gambling activities and not connected with his bookmaking operation. Agent Holmes, an expert in the field of illegal bookmaking and gambling, testified that part of a normal illegal bookmaking operation involves the frequent—if not constant—use of pay telephones. The district court could properly infer from the presence of the coins in the car that they were used in Roberts' bookmaking business. *Cf. Wingo,* 266 F.2d at 423 [context of circumstances warranted inference that cloth sacks found in Cadillac were being used for their accustomed purpose (the transfer of large quantities of cash in lottery business) although there was no testimony regarding the contents of the sacks]. The trial court in the instant case stated: "If he [Roberts] had quarters in the car to use the telephone, obviously he was using the telephone—using the car to get to the telephone in order to guard against maybe wiretaps or anything, so that was a part of his business use of that automobile. I would say the car was—would probably be considered to be a mobile car [sic] forwarding device if you made telephone calls regularly from your car and required ninety dollars in quarters for that purpose." The presence of ninety dollars in quarters in the Lincoln automobile indicated to the trial

court that Roberts did not have a fixed place of business. From the fact that Roberts carried the quarters in his Lincoln automobile for use on pay telephones, the court could properly infer that the car was used as a part of his bookmaking activities.

The finding of the trial court cannot be said to be clearly erroneous.

AFFIRMED.